COMMONWEALTH vs. MARY SILVA WETHERELL.

Bristol.    February 1, 1960. — March 2, 1960.

Present: WILKINS, C.J., WILLIAMS, COUNIHAN, WHITTEMORE,
& CUTTER, JJ.

*Betting.  Evidence,* Judicial notice.  *Words,* "Commonly."

Under G. L. c. 271, § 27, this court took judicial notice that gambling on
treasury balances does not require attendance of the participants at a
gaming house, and that the apparatus of such gambling may be kept
and used in various places. [424]

Evidence at the trial of a complaint under G. L. c. 271, § 5, for commonly
keeping or suffering to be kept apparatus for the purpose of playing at
an unlawful game for money in a building or place actually used and
occupied by the defendant warranted a finding that gaming apparatus
consisting of "treasury balance tickets" found in a bag in a tin box
on a table in the basement of business premises actually used and
occupied by the defendant was "commonly" kept or suffered to be
kept there by her and warranted a conviction. [424]

COMPLAINT, received and sworn to in the First District
Court of Bristol on April 18, 1959.

Upon appeal to the Superior Court the defendant was
found guilty at a trial before *Sgarzi,* J., a District Court
judge sitting under statutory authority, and alleged an ex-
ception to denial of her motion for a directed verdict of not
guilty.

*Francis D. Mone,* for the defendant.

*Peter B. Gay,* Assistant District Attorney, for the Com-
monwealth.

WHITTEMORE, J.    There was sufficient evidence to war-
rant a finding of guilty of the offence charged in the com-
plaint under G. L. c. 271, § 5, which, omitting that part of
the complaint descriptive of the offence of keeping "a com-
mon gaming house," was in these words: "commonly keeps
or suffers to be kept in a building or place actually used and
occupied by her, tables or other apparatus for the purpose
of playing at an unlawful game or sport for money . . . ."

The defendant testified that she was the president and treasurer of Moonbeam Inc., and in control of its premises at 59 Short Street, Taunton, on April 17, 1959, when, at about 2 P.M., the police, with a search warrant, entered the premises. On the main floor of the one story building were a restaurant bar and kitchen. In the basement were a small private office, a refrigerator, a cooler, a freezer, and a work table for the preparation of food. The basement was also used for the storage of food and cases of beer. The basement could be entered from the outside by a rear entrance and from the inside by a stairway from the kitchen. When the police entered, the defendant was behind the bar. The police found on a table in the basement an unlocked tin box about thirty-six inches long and eighteen inches wide and deep, which contained a brown bag. In the bag was an envelope containing twenty-five "sealed treasury balance tickets," some opened treasury balance tickets, and $61.50 in cash. Numbers on three or four of the tickets were circled with the notation "Hits," and there were figures under the circled numbers. The police remained on the premises for two and one half hours "waiting for some other person whom they believed was responsible for the contents of the paper bag." At the end of that time they told the defendant of their discovery; she denied any knowledge of or connection with the material found, and testified that the writing on the tickets was not hers. She testified that delivery men, waitresses, bartenders, and the chef had access to the basement and frequently used it. While the police were there a delivery of groceries was made to the basement by way of the stairs and two deliveries of beer by way of the outside rear entrance. During the two and a half hour interval, the defendant answered two telephone calls. On the first call a voice inquired, "Is the sun shining brightly?" The second call was from a child of the defendant who asked, "Did the police find anything?" To this the defendant replied, "I will talk with you later." The police had previously searched the defendant's home in her absence but in the presence of the child of the defendant.

The defendant does not deny that the "treasury balance tickets" were betting slips and hence gaming apparatus. G. L. c. 271, § 27. *Commonwealth* v. *Adams*, 160 Mass. 310. *Commonwealth* v. *Gorman*, 164 Mass. 549, 550. *Commonwealth* v. *Carlson*, 331 Mass. 449, 451. *Commonwealth* v. *Pasquale*, 334 Mass. 669, 670. Neither does the defendant deny that the basement was a "place actually used and occupied" by her. *Commonwealth* v. *Kimball*, 105 Mass. 465, 467. Compare *Commonwealth* v. *Dean*, 1 Pick. 387.

Under G. L. c. 271, § 27, we take judicial notice that gambling or "playing" with treasury balance figures does not require attendance of the participants at a gaming house, and that the apparatus of the play may be kept and utilized at various places, as, perhaps, in part on the persons of agents, in part at substations where records of some bets are kept, and in part at a central clearing house. See *Commonwealth* v. *McCluskey*, 123 Mass. 401, 406.

The offence of keeping gaming apparatus or of being present where gaming apparatus is found (G. L. c. 271, § 17) was not charged. That statute has been construed to make punishable the possession of gaming apparatus anywhere. *Commonwealth* v. *Carlson*, 331 Mass. 449, 450–451. We need not decide whether mere possession of gaming apparatus or being found with it is also an offence under G. L. c. 271, § 5, for the evidence warranted the conclusion that the "apparatus" kept in the basement of 59 Short Street was utilized there for some of the purposes of the game.

To support the conclusion that the defendant "commonly keeps or suffers to be kept" the evidence must support the inference that the place has been used "for some substantial period of time" for the purpose alleged. *Commonwealth* v. *Charlie Joe*, 193 Mass. 383, 386. Compare *Commonwealth* v. *Lambert*, 12 Allen, 177. See *Commonwealth* v. *Whitney*, 5 Gray, 85, 86–87. There was a suggestion of regular careful custody in the place where the slips were found. The cache had some aspects of a substation. This was enough to support an inference that the place was "commonly" used for the illegal purpose (*Commonwealth* v. *Mahony*, 14 Gray, 46;

*Commonwealth* v. *Webster*, 6 Allen, 593, 594) and we need not weigh the probative worth of the ambiguous telephone calls. See *Commonwealth* v. *Jensky*, 318 Mass. 350.

The motion for a directed verdict was rightly denied.

*Exceptions overruled.*